**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |  |
|---|---|---|
| | ) | |
| **ALSACIA DE LOS SANTOS,** | ) | |
| | ) | **02 Civ. 8453 (RCC)** |
| **Plaintiff,** | ) | |
| | ) | |
| **- against -** | ) | |
| | ) | |
| **THE CITY OF NEW YORK, POLICE** | ) | **OPINION &** |
| **DEPARTMENT OF THE CITY OF NEW YORK, and** | ) | **ORDER** |
| **CHRISTOPHER PASQUERELLI, sued herein in his** | ) | |
| **Individual Capacity as Employee, Agent and/or** | ) | |
| **Servant of the CITY OF NEW YORK and/or the** | ) | |
| **POLICE DEPARTMENT OF THE CITY OF** | ) | |
| **NEW YORK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

**RICHARD CONWAY CASEY, United States District Judge:**[1]

## I.      BACKGROUND

Alsacia De Los Santos ("Plaintiff") brings this action against the City of New York ("City"),

the Police Department of the City of New York ("NYPD"), and Lieutenant Christopher Pasquerelli

("Lt. Pasquerelli") (collectively "Defendants").  She alleges (1) that Lt. Pasquerelli, acting under

color of law and under his authority as a Lieutenant and Platoon Commander for the City of New

York and the NYPD, retaliated against her for speaking about matters of public concern, namely,

sexual activity between two officers, in violation of 42 U.S.C. § 1983 and the First and Fourteenth

Amendments of the Constitution; (2) that the City and the NYPD should be held liable for these

violations of Plaintiff's rights; and (3) that Defendants took adverse actions against her in retaliation

_____

[1] The Honorable Richard Conway Casey passed away on March 22, 2007.  Prior to his death, Judge Casey completed a substantial portion of the work on this case.  In his honor and on his behalf, I issue this opinion in his name.

for her opposing and reporting what Plaintiff reasonably believed to be sexual harassment in violation of New York Executive Law § 290 et seq. and the Administrative Code of the City of New York § 8-107 et seq. Defendants move for summary judgment on several grounds, namely: (1) Plaintiff fails to state a claim under the First Amendment; (2) Plaintiff cannot show municipal liability; (3) Lt. Pasquerelli is entitled to qualified immunity on Plaintiff's federal claims; and (4) Plaintiff fails to state a claim as to the state and municipal human rights laws. The Court holds that Plaintiff's conversations with her superiors in which she reported a sexual encounter between two police officers did not constitute speech on a matter of public concern for purposes of her First Amendment retaliation claim. Further, the Court finds that no rational trier of fact could conclude Plaintiff was retaliated against for reporting an act of sexual harassment. Therefore, as further explained below, Defendants' motions for summary judgment are granted.

## I.    FACTS

The following facts are presented in the light most favorable to Plaintiff and undisputed (for the purpose of this motion) unless otherwise noted.

On or about August 20, 1999, Plaintiff began her employment with the NYPD in the civilian title of City Custodial Assistant. (See Pl. Dep. at 24-25.) Plaintiff was assigned to the Bronx Task Force ("BTF"). (See id. at 24.)

In September 1999, Plaintiff was assigned, at her request, to the 8:00a.m.-to-4:30p.m. shift. (See Pl. Dep. at 28, 29, 31.) Early one morning that September, Plaintiff opened the door to a locker room and witnessed Lt. Kevin Leddy and Police Officer Tara Eckert engaged in a sexual act while in uniform. (See id. at 71-72.) Specifically, Plaintiff claims that she witnessed Officer Eckert on Lt. Leddy's lap and that Lt. Leddy had Officer Eckert's breast in his mouth. (See id. at 72.) Plaintiff

alleges that she remained at the door for approximately one second before she pulled it closed.  (See id. at 75.)  Plaintiff alleges that Lt. Leddy, who had been facing away from the locker room door, turned around.  (See id.)

The record reflects that about a year later, while cleaning in the locker room, Plaintiff informed Sgt. Kim Maguire, her immediate supervisor, about what she saw the year before.  (See id. at 29, 81-82.)  In her deposition, Plaintiff testified that Sgt. Maguire's reaction suggested that the relationship and activities of Lt. Leddy and Officer Eckert were already known at the BTF.  (See id. at 81.)  Plaintiff first testified that she told Sgt. Maguire she witnessed an act of sexual harassment (see id. at 83); later she added that she did not believe what she witnessed was sexual harassment (see id. at 171-72).

Plaintiff testified that she did not know whether Sgt. Maguire ever informed Lt. Pasquerelli, Lt. Leddy, Officer Eckert, or Captain Michael Pilecki[2] about the events she witnessed.  (See id. at 97, 99.)  In fact, Plaintiff asked Sgt. Maguire not to tell anyone about what she witnessed.  (See id. at 91 ("I asked her, please don't say nothing.  I don't want to get in trouble so I guess she didn't mention it to nobody.").)

Plaintiff testified that she also told Police Officer Carmen Koota, who was not assigned to the BTF at the time, what she witnessed.  Plaintiff stated that she informed Officer Koota after she told Sgt. Maguire.  (See id. at 79.)  Plaintiff testified that Officer Koota said, "that's old news, girl." (Id.)  Plaintiff does not allege this exchange is either protected speech or a cause of the alleged

---

[2] Captain Michael Pilecki was assigned to the BTF from March 2000 through June 2001. (See Pilecki Dep. at 7.)  He was the executive officer from March 2000 until September 2000, at which time he became the Commanding Officer.  He remained in that position until he transferred out of the BTF in June 2001.  (Id.)

retaliation.[3]

Plaintiff stated that "awhile after" she witnessed the sexual activity—sometime after the incident and definitely after she spoke with Sgt. Maguire—while she was cleaning in an adjacent room, she believes she overheard Lt. Leddy tell Lt. Pasquerelli that Plaintiff had found him with Officer Eckert in the Lieutenant's locker room.  Plaintiff alleges that she overheard Lt. Pasquerelli respond that he would make her life impossible.  (See Pl. Dep. at 90-91; Compl. at 20.)[4]

Plaintiff testified that sometime before May 2001, just before Captain Pilecki transferred out of the BTF, Captain Pilecki asked her if she had witnessed anything occur between Lt. Leddy and Officer Eckert.  Plaintiff testified that she told Captain Pilecki about the sexual activity that she had witnessed.  (See Pl.'s Dep. at 109, 110.) Plaintiff admitted that she did not tell Captain Pilecki (or anyone else at the BTF) about the alleged conversation between Lt. Leddy and Lt. Pasquerelli . (See id. at 92-93, 109-112.)  Plaintiff testified that she did not know what, if anything, Captain Pilecki did after she told him about the sexual activity that she witnessed.  (See id. at 115.)  In fact, Captain Pilecki reported the conduct of Lt. Leddy and Officer Eckert to the Internal Affairs Bureau of the NYPD ("IAB").

Plaintiff alleges that Lt. Pasquerelli retaliated against her because she informed Sgt. Maguire and Captain Pilecki about the alleged sexual act.  (See Compl. at 26; Pl. Dep. at 175-77.)  Her theory

---

[3] The evidence before the Court suggests that Plaintiff told at least one other officer—Police Officer Mark Lawrence—that she had witnessed the sexual act between Lt. Leddy and Officer Eckert.  (See Def.'s Ex. I (Internal Affairs Report) at 2-3.)  The record reflects that Officer Lawrence worked in the same building as Plaintiff but was not assigned to the Bronx Task Force.

[4] Notwithstanding this testimony, Plaintiff admitted that she did not see who was speaking or who was in the room.  (See Pl. Dep. at 90-91.)

is that Lt. Pasquerelli retaliated against her on behalf of his friend Lt. Leddy. (See id. at 174-75.) She stated that the retaliation began sometime near the end of 1999[5] (see Pl. Dep. at 146, 172-174), though the exact time period of the alleged retaliation is unclear based on her testimony.  Whenever it started, Plaintiff testified that all alleged retaliation ended in September 2001, when she was transferred to the 30th Precinct.  (See id. at 145-48; Compl. at 26, 31.)

Plaintiff testified that even prior to witnessing Lt. Leddy and Officer Eckert engaged in a sexual act, and prior to informing anyone at the BTF about what she saw, Lt. Pasquerelli took negative actions towards her because he did not like her.  (See id. at 42. ("The guy didn't like me.").) Plaintiff testified that she believed Lt. Pasquerelli disliked her because she was a custodian and from the Dominican Republic.  (See id. at 101-102.)

Between the end of 1999 and May 2001, Plaintiff claims that Lt. Pasquerelli retaliated against her by (1) on one occasion not permitting her to enter the BTF's gym; (2) accusing her of stealing his wallet; (3) accusing her of poor work performance; and (4) following her around the command.

First, with regard to the gym incident, Plaintiff testified that on one occasion, at the end of 1999, Lt. Pasquerelli refused to let her use the BTF's gym because officers under his command were then using the gym.  (See id. at 68-69, 145-146.)

Second, Plaintiff contends that another police officer told her that Lt. Pasquerelli believed that she stole his wallet.  (See id. at 108.)  In fact, on or about November 2000, Lt. Pasquerelli filed a complaint with the IAB alleging that his wallet had been stolen and mentioning that Plaintiff had

---

[5] It is important to note with respect to Plaintiff's retaliation claims that Plaintiff did not tell Sergeant Maguire of the incident until September 2000.

access to the locker room.  (See Pasquerelli Dep. at 108, 111-112, Pl.'s Ex. F (Internal Affairs Compl.).)  Plaintiff testified that she was never interviewed by IAB or informed of any investigation by IAB into the stolen wallet. (See Pl. Dep. at 108.)  Plaintiff testified Lt. Pasquerelli never personally accused her of stealing his wallet.  (See id. at 109.)

Third, Plaintiff claims that Lt. Pasquerelli began complaining to Captain Pilecki about her performance, probably in late 2000.  Plaintiff testified that she became aware of Lt. Pasquerelli's complaints through a conversation with Police Officer Raymond Marino sometime in 2001.  (See id. at 107.)  Plaintiff admitted that she was not disciplined as a result of Lt. Pasquerelli's complaints about her performance.  (See id. at 107.)

Fourth, Plaintiff alleges that in 2000 Lt. Pasquerelli began following her around the command constantly questioning her and accusing her of not performing her job.  (See id. 101-107, 149.)  Plaintiff assigned no particular time period to these actions.

Between May 2001 and September 2001, Plaintiff claims that Lt. Pasquerelli's acts of retaliation consisted of:  (1) changing her work hours on two separate occasions; (2) citing her for baseless violations; (3) calling her at her residence; (4) intimidating her by following her home in his car on one occasion; (5) "constantly following her around the command including to the supply room and the basement" (see Pl.'s 56.1 Stmt. ¶ 38); (6) making her eat all her meals in the garage; and (7) purposefully directing officers to walk across a freshly mopped floor.[6]

First, Plaintiff testified at her deposition that Lt. Pasquerelli transferred her tour ten times,

_____

[6] Plaintiff alleges that prior to her transfer to the 30th Precinct, Lt. Pasquerelli called her soon-to-be supervisor Lt. John Crowley.  (See id. at 154.)  Plaintiff admitted that she had no personal knowledge that Lt. Pasquerelli called Lt. Crowley, nor did she know what Lt. Pasquerelli allegedly said to Lt. Crowley.  (See id. at 154.)  Plaintiff appears to have dropped this allegation.  (See Pl.'s 56.1 Statement ¶ 38.)

then four to six times, then three times.  (See Pl. Dep. at 119-123.)  Plaintiff's 56.1 statement now

indicates the number at two.  (See id. at 40-44, 121.)  Plaintiff also alleged that she requested shift

transfers to accommodate her child care needs which were granted by Sgt. Maguire, but which on

some occasions Lt. Pasquerelli subsequently changed or denied.  (See id. at 32-33, 37, 40-41,

133-134.)

      Lt. Pasquerelli testified he had the authority to change Plaintiff's tours, but that such a

change would "last for about two minutes" because a captain—"any captain"—would correct any

change if he made one.  (See Pasquerelli Dep. at 133-134.)  It is undisputed that Plaintiff lost no

income as a result of the alleged tour changes.  (See Pl. Dep. at 123-124.)

      Second, Plaintiff alleges Lt. Pasquerelli cited her for violations she did not deserve (or

encouraged others to do so).  In July 2001, Sgt. Maguire entered Plaintiff in the NYPD's Minor

Dereliction Log ("MDL") after she and Lt. Pasquerelli learned that Plaintiff was sitting or sleeping

in her van during her work shift.[7]  (See Pasquerelli Dep. at 126-27.)  Plaintiff's tour was changed

thereafter so she worked the same tour as her supervisor, Sgt. Maguire.  In August 2001, Lt.

Pasquerelli placed plaintiff in the MDL for being discourteous to a supervisor.  (See Pasquerelli

Dep. at 54-55, 129.)  Plaintiff testified that she was not disciplined at any time as a result of Lt.

Pasquerelli's alleged complaints.  (See Pl. Dep. at 67, 107.)

      Third, Plaintiff alleges that in June of 2001, Lt. Pasquerelli called Plaintiff's home.  Plaintiff

testified that her child answered the phone because she was not home.  (See id. at 134.)  Plaintiff

testified that her child told her that Lt. Pasquerelli called to see if she was home.  (See id. at 135.)

---

[7] The MDL is a log book used to record employees' behavior that does not warrant
formal discipline, but it appears that several entries could trigger more severe discipline. (See
Pasquerelli Dep. at 50-51.)

Plaintiff testified she believed this was retaliatory because Lt. Pasquerelli had never called her home before.  (See id. at 135; Compl. at 28.)

Fourth, Plaintiff alleges that on one occasion Lt. Pasquerelli intimidated her when he followed her in his car as they were both leaving work.  (See Compl. at 28.)  Plaintiff testified that both she and Lt. Pasquerelli left work at the same time and were driving on I-87 North.  When Plaintiff turned onto the Major Deegan Highway, Lt. Pasquerelli did not.  (See Pl. Dep. at 124-127.)

Fifth, as described above, Plaintiff alleges that Lt. Pasquerelli continued following her around the command including to the supply room where she testified that Lieutenants did not go. (Id. at 118-19, 124.)  She testified that this activity would frighten her.  (Id.)

Sixth, Plaintiff testified that in the summer of 2001 she was assigned to the BTF garage and forced to eat all of her meals there.  (See id. at 129-131.)  Plaintiff believed that this assignment was retaliatory because she is asthmatic.  (See id.)  Plaintiff admitted that she did not know if Lt. Pasquerelli knew she was asthmatic.  During a heat wave in the summer of 2001, Plaintiff claims she suffered an asthma attack while in the garage.  (Id.)

Finally, Plaintiff proffered evidence, in the form of an Internal Affairs report, that on occasion Lt. Pasquerelli ordered several officers who were entering the precinct to walk across a wet floor that Plaintiff had just mopped.  (See Pl.'s Ex. H at 4-5.)  Apparently, a detour was possible but not taken.  (Id.)

Plaintiff testified that she knew of no other employee whom Lt. Pasquerelli allegedly retaliated against.  (See id. at 169.)

Plaintiff alleges that in or about June 2001, she contacted the Civilian Complaint Review Board ("CCRB") to report that she believed Lt. Pasquerelli was retaliating against her because she

witnessed Lt. Leddy and Officer Eckert engaged in a sexual act.  (See id. at 139; Compl. at 27.) Plaintiff also testified that she informed CCRB about the alleged conversation that she overheard between Lt. Leddy and Lt. Pasquerelli.  (See Pl. Dep. at 94, 138, 139.)  CCRB does not have a record of any June 2001 complaint from Plaintiff.  (See Def.'s Ex. G.)

On or about August 13, 2001, Plaintiff contacted the New York City Police Department's Office of Equal Employment Opportunity ("OEEO") to file a complaint.  Plaintiff alleges that she told the OEEO about the sexual activity she witnessed in the locker room (see id. at 86), though there is record evidence that suggests she did not convey such information, and that in fact she complained she was being harassed because of "their belief that she does not perform her duties" (see Def.'s Ex. F).  Plaintiff testified that she waited before contacting OEEO because she was unaware of the existence of the office (see Pl. Dep. at 88), but she admitted that an OEEO sign explaining the complaint procedure had been posted in the entranceway of the BTF since she was assigned there (see id. at 57-58, 88).  Additionally, Plaintiff admitted that she received a copy of the NYPD's Employee Manual in August 1999, which contained information on the OEEO.  (See id. at 57.)

NYPD OEEO advised Plaintiff that, because she was not alleging that she had been harassed based upon a protected status, OEEO lacked jurisdiction over her complaint and that Plaintiff should instead contact NYPD Labor Relations.  (See Pl. Dep. at 87; Exhibit F.)  She did not.  (See Pl. Dep. at 93.)

In September 2001, Plaintiff transferred to the 30th Precinct.  (See Pl.'s Dep. at 145-48; Compl. ¶¶ 26, 31.)  Plaintiff assumed the same civilian title and duties at the 30th Precinct.  (See Pl. Dep. at 151.)  On September 7, 2001, Plaintiff contacted the IAB to file a complaint of retaliation.

Plaintiff alleged to IAB that Lt. Pasquerelli was retaliating against her because of the sexual act that she witnessed between Lt. Leddy and Officer Eckert.  (See Def.'s Ex. H.)

On October 20, 2001, Plaintiff resigned, writing in the box marked "Reasons" that she was moving to Tennessee.  (See Def.'s Ex. J.)  She also checked various boxes indicating, inter alia, she was leaving on her own free will and not because of any threat or coercion and that she was not a victim of employment discrimination or sexual harassment.  (Id.)

On or about February 26, 2002, after Plaintiff had left the NYPD, the IAB completed its investigation into Plaintiff's allegations and its report indicated that the allegations against Lt. Pasquerelli for retaliation against Plaintiff were closed and disposed of as unsubstantiated.  (See Def.'s Ex. I.)

On October 23, 2002, Plaintiff filed the instant lawsuit.  On October 1, 2003, while this lawsuit was pending, Plaintiff was reinstated to the NYPD in the Traffic Control Division of the Department.  (See id. at 160, 188; Def.'s Ex. J.)

## II.   ANALYSIS

### A.    Summary Judgment Standard

Upon motion for summary judgment, a court shall render judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can

discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case, <u>Celotex</u>, 477 U.S. at 325.  The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial," <u>Celotex</u>, 477 U.S. at 322.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." <u>Lopez v. S.B. Thomas, Inc.</u>, 831 F.2d 1184, 1187 (2d Cir. 1987); <u>Eastway Constr. Corp. v. City of New York</u>, 762 F.2d 243, 249 (2d Cir.1985). Nevertheless, the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  If there is not, summary judgment is proper.  <u>Id.</u> at 249-50.

Finally, under Rule 56(d) of the Federal Rules of Civil Procedure, a court has the authority to "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted."  Fed. R. Civ. P. 56(d).

### B.    First Amendment Retaliation

To survive a motion for summary judgment on a First Amendment retaliation claim, a plaintiff must present evidence which shows "(1) that the speech at issue was protected, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected speech and the adverse employment action." <u>Cotarelo v. Village of Sleepy Hollow Police Dept.</u>, 460 F.3d 247, 251 (2d Cir. 2006) (internal quotation marks omitted).  Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action "'even in the absence of the

protected conduct." Id. at 251-52 (internal quotation marks omitted).   Plaintiff claims that two

protected communications led to retaliation and adverse employment actions by Lt. Pasquerelli: her

conversation with Sgt. Maguire and her conversation with Captain Pilecki both regarding her

observation of Lt. Leddy and Officer Eckert engaged in a sexual act.

Speech by a public employee constitutes a "matter of public concern if it relates 'to any

matter of political, social, or other concern to the community.'" Johnson v. Ganim, 342 F.3d 105,

112 (2d Cir. 2003) (quoting Connick v. Myers, 461 U.S. 138, 146 (1984)).  Whether an employee's

speech addresses a matter of public concern is a matter of law "'determined by the content, form,

and context of a given statement, as revealed by the whole record.'" Reuland v. Hynes, 460 F.3d

409, 416 (2d Cir. 2006) (quoting Connick, 461 U.S. at 147-48.)

In examining the content, form, and context of a statement, a court can consider motive, but

should not give motive dispositive weight.  See Lewis v. Cohen, 165 F.3d 154, 163-64 (2d Cir.

1999) ("[T]he court should focus on the motive of the speaker and attempt to determine whether the

speech was calculated to redress personal grievances or whether it had a broader public purpose");

Reuland, 460 F.3d at 415 (concluding that Lewis did not hold that motive was dispositive factor).

Similarly, the fact that a statement is made in private and at work, militates against a finding of

"public concern," but is not dispositive.  See Garcetti v. Ceballos, 126 S. Ct. 1951, 1959 (2006)

("That [plaintiff] expressed his views inside his office, rather than publicly, is not dispositive.

Employees in some cases may receive First Amendment protection for expressions made at work.");

United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995) (finding statement

constituted a public concern because, inter alia, "the content had nothing to with [plaintiffs'] jobs"

and the statement did "not address audiences composed of co-workers or supervisors; instead, they

write or speak for segments of the general public").  Matters that are purely personal or calculated to redress personal grievances will not qualify as public concerns.  Hoyt v. Andreucci, 433 F.3d 320, 330 (2d Cir. 2006).  Moreover, comments by a public employee on internal office matters do not constitute public concern and thus are not entitled to constitutional protection.  See Connick, 461 U.S. at 148-149 ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case."); Kelly v. City of Mount Vernon, 344 F. Supp. 2d 395, 402 (S.D.N.Y. 2004) ("Speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, cannot support a First Amendment claim."); Cahill v. O'Donnell, 75 F. Supp. 2d 264, 272 (S.D.N.Y. 1999) (same).

Neither Plaintiff's comment to Sgt. Maguire nor her comment to Captain Pilecki address matters of public concern as determined by their content, form, and context.  As to content, sometime in September 2000 Plaintiff communicated to two superiors the inappropriate activity that transpired between Lt. Leddy and Officer Eckert.  Her statements depict a single event in the workplace, are devoid of any social commentary, and do not suggest an endemic problem that might impact the public or warrant its concern.  She spoke not of the sexual acts of police but of the sexual act between two police officers; the content of Plaintiff's statement is facially insular.  The form and context of Plaintiff's speech reinforce this impression.  Plaintiff spoke in both circumstances as an employee, both times in private, both times briefly recounting what she witnessed a year or more after she witnessed it.  Inasmuch, her comments contain no sense of urgency, nor formality, nor inclination to warn the citizenry of some pending harm.  There is no evidence at all of any concern

for the public weal.  The content, form, and context of the comments do not suggest Plaintiff was speaking as a citizen on a matter of public concern, but rather as an employee upset at what she witnessed.  Compare Fusco v. City of Rensselaer, N.Y., No. 03 Civ. 1487 (TJM), 2006 WL 752794, at *8 (N.D.N.Y. March 22, 2006) ("[S]peech about individual or isolated problems within a police department, or one of its officers, are not matters of public concern.") with Morris v. Lindau 196 F.3d 102, 111 (2d Cir. 1999) (holding the public expressions of police officers which "included speech on crime rates, police staffing, equipment shortages and related budgetary matters quite plainly involve matters of public concern.").

Plaintiff's motive for speaking is particularly difficult to discern from the record.  On the one hand, Plaintiff did not exhibit the pure personal employment interest contemplated in the case law, see Ezekwo v. New York City Health and Hosps. Corp., 940 F.2d 775, 781 (2d Cir.) cert. denied 502 U.S. 1013 (1991), save for, perhaps, the goal of sparing herself another unwelcome early-morning encounter.  And Plaintiff testified that she perceived some risk in disclosing to anyone what she saw. Just the same, as discussed above, Plaintiff was not on a mission to protect the public welfare.  See id. at 781.  The first time she disclosed what she saw—a secretive conversation with Sgt. Maguire about co-workers' conduct—exhibits all the trappings of office gossip, not of constitutionally protected speech.  The motive to dispense gossip, even gossip of interest to the public, does not denote public concern.  Koch v. City of Hutchinson, 847 F.2d 1436 (10th Cir.1988) ("[W]hat is of general interest to the public is not necessarily of public concern for First Amendment purposes.").  Plaintiff's motive for speaking with Captain Pilecki—she was asked to—looks less like gossip, but no more like constitutionally protected speech.

As to both conversations, Plaintiff improperly seeks to take an employment problem,

14

construe it broadly, and stamp it a public concern.  See Ezekwo, 940 F.2d at 781. ("[T]he mere fact that one or two of Plaintiff's comments could be construed broadly to implicate matters of public concern does not alter the general nature of her statements.")  The Court holds that Plaintiff's conversations with her superiors in which she reported a sexual encounter between two police officers did not constitute speech on a matter of public concern for purposes of her First Amendment retaliation claim.  Thus, the Court need not reach the remaining elements of Plaintiff's claim.

Although Plaintiff's speech is not covered by the First Amendment, the Court does not hold that First Amendment protection is per se unavailable for speech regarding inappropriate sexual conduct between officers.  Had Plaintiff, dissatisfied with the response from higher-ups, reported the act to the press, or written a member of the city council, or generated for her superiors some authentic concern about the impact of such acts on the chain of command, or mustered a belief that such activity was hampering the BTF's emergency response time, or some other such scenario where Plaintiff spoke to the public or for the public as a citizen or concerned employee, perhaps on-the-job sexual activity between officers could qualify as a matter of public concern.  Absent a similar scenario, however, this matter is distinctly, and quite literally, an internal affair.

As such Plaintiff's First Amendment retaliation claim is subject to dismissal by way of summary judgment.

**C.      Claims Pursuant to City and State Human Rights Laws**

Plaintiff and Defendants agree that Plaintiff's state and city human rights claims are analyzed under the same framework as a claim pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.  See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) ("New York courts require the same standard of proof for claims brought under the

[Human Rights Law] as those brought under Title VII.") (alteration in original).  Title VII forbids an employer to retaliate against an employee for, <u>inter alia</u>, complaining of employment discrimination prohibited by Title VII.  <u>See</u> 42 U.S.C. § 2000e-3(a); <u>Kessler v. Westchester County Dept. of Social Servs.</u>, 461 F.3d 199, 205 (2d Cir. 2006).  In order to present a prima facie case of retaliation under Title VII, Plaintiff must present evidence sufficient to permit a rational trier of fact to find, first, that she engaged in protected participation or opposition under Title VII; second, that the employer was aware of this activity; third, that the employer took adverse action against her; and fourth, that a causal connection exists between the protected activity and the adverse action.  <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001).   Plaintiff has not and cannot make such a showing.

To establish that she participated in a protected activity, an employee need not prove that the conditions she complained about actually constituted unlawful conduct amounting to a violation Title VII.  <u>See</u> <u>Wimmer v. Suffolk County Police Dept.</u>, 176 F.3d 125, 134 (2d Cir. 1999); <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u> 136 F.3d 276, 292 (2d Cir. 1998); <u>Reed v. A.W. Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996).  Rather, the employee must demonstrate only that she had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.  <u>See</u> <u>Wimmer</u>, 176 F.3d at 134 (citing <u>Manoharan v. Columbia Univ. College of Physicians & Surgeons</u>, 842 F.2d 590, 593 (2d Cir.1988)).  The "reasonableness" of an employee's belief is assessed in light of the totality of the circumstances.  <u>See</u> <u>Galdieri-Ambrosini</u>, 136 F.3d at 292.  Further, the employee's belief that she was opposing an employment practice prohibited by Title VII—here sexual harassment—must also be objectively reasonable.  <u>Spadola v. New York City Transit Auth.</u>, 242 F. Supp. 2d 284, 291 (S.D.N.Y. 2003).

A rational trier of fact could not find that Plaintiff, subjectively or objectively, possessed a reasonable, good faith belief that the sexual act she witnessed constituted sexual harassment. Nowhere in her deposition testimony (or in any other evidence submitted to the Court) does Plaintiff state that she believed there was something unlawful about the activity between Officer Eckert and Lt. Leddy, though she rightfully concluded it was improper.  (See Pl. Dep. at 82 ("That's incorrect to do that in a place of a job."); id. at 170-71 ("[I]t's unprofessional to do that at a job place what they were doing. . . . That's not the appropriate place.").)  More to the point, while Plaintiff did say in her deposition that she told Sgt. Maguire the act she witnessed was sexual harassment (see Pl. Dep. at 82-83 ("Q: My question is, did you tell Sergeant Maguire that you witnessed an act of sexual harassment? A: Yes."), she later explained that she herself did not believe the act constituted sexual harassment (see id. at 170-172).   The following excerpt from Plaintiff's deposition explains Plaintiff's clarification:

> Q:      We talked about sexual harassment earlier.  All I'm asking you, I think we have established, and correct me if I'm wrong, that the act that you allegedly witnessed between Leddy and Eckert was not sexual harassment towards you.
> A:      Right.
> Q:      Is that correct?
> A:      Correct.
> Q:      But earlier you stated that that was an act of sexual harassment; is that correct?
> A:      Correct me if I'm wrong, that's not a[n] actual sexual harassment neither towards me or towards them.  I don't think he forced her to come on.  That's sexual harassment to me, when you're being forced.  If I found them, that wasn't forced.  That was because they were willing what to do whatever they were doing.
> Q:      To make the record clear, [the] Leddy and Eckert incident was not an act of sexual harassment towards you?
> A:      Correct.
> Q:      And you don't think it was an act of sexual harassment either on Lieutenant Leddy or on Police Officer Eckert; isn't that correct?
> A:      Correct.

17

> Q:      So you don't think that act constituted sexual harassment; is
> that correct?
> A:      Correct.

(Pl. Dep at 170-172.)  Thus, while there may be a triable issue as to whether Plaintiff uttered the

words "sexual harassment" to Sgt. Maguire while speaking with her in the locker room, there is no

issue as to whether, subjectively, Plaintiff reasonably believed the act she witnessed was unlawful

sexual harassment.[8]  A rational jury simply could not conclude that Plaintiff possessed a reasonable,

good faith belief that she was reporting an act of sexual harassment while at the same time

acknowledging that Plaintiff herself did not believe she had witnessed an act of sexual harassment

at all.  Nor can the single consensual sexual act between Lt. Leddy and Officer Eckert —or their

apparent ongoing affair—objectively be considered sexual harassment.  See generally Meritor Sav.

Bank, FSB v. Vinson, 477 U.S. 57 (1986); Harris v. Forklift, Sys. 510 U.S. 17 (1993); Alfano v.

Costello 294 F.3d 365, 374 (2d Cir. 2002).

---

[8] The Court does not believe the deposition testimony at pages 82-82 cited supra directly conflicts or contradicts the testimony at pages 170-172, also cited supra.  To the extent that there is any conflict, the Court cannot accept Plaintiff's position that the Court should ignore the later testimony and view the earlier testimony in isolation.  It is true that the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion."  Lopez, 831 F.2d at 1187.  But here Plaintiff herself has resolved the ambiguity and Plaintiff's suggestion would allow her a markedly unreasonable inference.  It is consistent with the Court's duty at the summary judgment stage to find that the earlier testimony should yield to the subsequent clarification, because a plausible explanation for the difference, namely that Plaintiff appeared unclear in her early testimony and later clarified her comments.  Cf. Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 112 (2d Cir.1998) (holding that a court can disregard ambiguous, confusing or incomplete testimony where subsequent, clearer testimony is available.); Jeffreys v. City of New York, 426 F.3d 549, 555 n.2 (2d Cir. 2005) (same).

18

Accordingly, Plaintiff's state and city human rights claims are subject to summary judgment and the Court need not reach the remaining elements of her retaliation claims.  Because the Court finds the Defendants' motion should be granted on grounds (1) and (4), it need not address Defendant's immunity theories expressed in grounds (2) and (3).

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.   The

Clerk of the Court is directed to close this case and remove it from the Court's active docket.

**So Ordered:**   New York, New York
April 3, 2007

John F. Keenan, U.S.D.J.
on behalf of
**Richard Conway Casey, U.S.D.J.**

20